UNITED STATES, for Use of GILLIOZ, v.
JOHN KERNS CONST. CO. et al.
Civil Action No. 12717.

Circuit Court of Appeals, Eighth Circuit.
Feb. 10, 1944.

Rehearing Denied March 10, 1944.

Thomas S. Buzbee, of Little Rock, Ark. (Edward L. Wright, John M. Harrison, and Alvin S. Buzbee, all of Little Rock, Ark., on the brief), for appellant.

Howard Cockrill, of Little Rock, Ark. (John Sherrill, of Little Rock, Ark., on the brief), for appellees.

Before SANBORN, and WOODROUGH, Circuit Judges, and HULEN, District Judge.

HULEN, District Judge.

Appellant in this case sued for a balance due for work performed under a sub-contract with appellee John Kerns Construction Company.[1] Appellees answered with a counter-claim, alleging there was due from appellant liquidated damages for failure to complete the work called for by sub-contract within the time specified.

The case was tried without a jury. The parties stipulated there was due appellant $14,023.86. The contest is on the counter-claim. The Court found for the Construction Company on its counter-claim in the sum of $34,750 and awarded judgment in its favor for the difference between the respective amounts or $20,726.14. From this judgment appellant prosecutes this appeal. He presents the following grounds for reversal of the judgment.

First: That the delay of appellant in completing work under the sub-contract was "caused or contributed to by the failure of the engineers to furnish plans", thereby cancelling any obligation of appellant to respond in liquidated damages for delay so caused or contributed to.

Second: That the Construction Company agreed to waive any claim it had against appellant for liquidated damages, subsequent to the events and time which were the basis therefor.

Third: That mutual accounts were submitted from time to time and the Construction Company failed to make any claim for liquidated damages in the account submitted by it and that the stated accounts became final between the parties.

On June 10, 1940, the Construction Company entered into a contract[2] with the United States for the erection of a dam, known as the Blue Mountain Dam Project in Yell County, Arkansas. The Construction Company furnished a bond, with appellee, Hartford Accident & Indemnity Company as surety, conditioned upon the Construction Company making payment to all persons supplying labor and material provided for by the contract.

The appellant and the Construction Company entered into a sub-contract on June 22, 1940, for appellant to perform part of the work covered by the prime contract.

The prime contract work was to be completed within 400 days. The sub-contract work was to be completed by December 15, 1940. The Construction Company defaulted on its contract in 1941. Its completion was taken over by the surety. Appellant completed work under its sub-contract and a subsequent modification thereof on June 5, 1941.

The sub-contract provided for liquidated damages of $250—"per day for each and every day of delay". The prime contract set forth penalties "as liquidated damages", for failure to complete the contract on

---

[1] Herein referred to as Construction Company.

[2] Herein referred to as the "prime" contract.

time, excepting delays due to "unforeseeable causes beyond the control and without the fault or negligence of the contractor, including * * * acts of the government". The prime contract set out the procedure by which the contractor could apply for, and the Government could grant, extensions of time for the completion of the work by the contractor.

The Government engineers were first charged with delay in November, 1940. The Construction Company wrote to appellant on November 12, 1940, in answer to a complaint by appellant, that he was being delayed in completion of his work under the sub-contract, by "crews waiting for engineers (Government) stakes." The letter stated: "Any decision on changes have to be made by the Little Rock offices, so therefore the engineers crew could not go ahead with staking until that approval had been given".

On December 13, 1940, appellant wrote the Construction Company, describing conditions as they affected proceeding with the work called for by the sub-contract. We quote: "On the north portal and access road there has not been anything definite to date—the engineers only had one core boring on the entire length of the access road. The contractor has been forced to locate the rock elevations and has also been forced to do the exploration work and open up the work before any definite stakes or instructions could be furnished by the engineers. This has caused our crews much serious delay as they have been disorganized at all times, for as each new classification is exposed our crews have been delayed until the engineers could decide what should be done. If soundings had of been taken our crews would not have been delayed, as the shovel would have excavated the top conglomerate materials and then the drill crew could have drilled and shot the rock far enough in advance to keep the shovel busy."

On December 26, 1940 (11 days after sub-contract work was to be completed and penalty to start), the Construction Company wrote the Government engineer in charge of the project. The following paragraph from that letter refers to work covered by the sub-contract: "On Monday, December 26, 1940 Mr. Pittman and Mr. Whittemore were here. Mr. Hays, Mr. Andrews, our Mr. Laird and the writer spent considerable time going over these north tunnel end conditions and we were advised that a redesign of the areas to be excavated could probably be expected at once".

Changes in the plans and specifications affecting work to be done under the sub-contract continued until April 14, 1941, when the Government engineers approved Change Order No. 5. This change order modified the prime contract with respect to the work to be done by appellant under the sub-contract. The Change Order extended the time for completion of work under the prime contract for 24 days. The Change Order was issued approximately four months subsequent to the date work under the sub-contract was to be completed. Change Order No. 5 was the subject of the following finding by the trial court: "8. The subcontractor discovered latent conditions which he deemed differed from those indicated by the specifications, advised the contractor of it, and in turn the contractor called this to the attention of the contracting officer, who issued Change Order No. 5 modifying the contract and increasing the price and awarding additional time for completion, the total amount of which time was allowed the sub-contractor."

Appellant and the Construction Company entered into a supplemental contract on April 18, 1941, whereby the Construction Company took over certain of the work called for by the sub-contract. Proceeding under the two agreements, appellant finished his work on June 5, 1941. This was 173 days past December 15, 1940, the date provided in the sub-contract for its completion. The Construction Company allowed appellant 34 days extended time, which had been allowed to it for completing its prime contract work. The result, 139 days at $250.00 per day, is the basis of appellee's claim for liquidated damages and the Court's finding against the appellant in the sum of $34,750.

The sub-contract listed various items of work, such as "clearing site"; "comm. excav., general", etc.; set out quantity of work to be done on each item; unit price, with payment to appellant based on amount of work done. By the supplemental contract appellant surrendered the right to perform certain work under his sub-contract. This work being performed by the Construction Company, it in turn was entitled to be paid therefor and not appellant.

The Court found that preceding the execution of the supplemental contract the

Construction Company had agreed with appellant to relieve appellant from any liability for penalty or liquidated damages for failure to complete work called for by the sub-contract on December 15, 1940. This finding is based on substantial evidence.

Under this state of facts can appellant be held liable for liquidated damages where the evidence shows that performance of the work specified in the sub-contract within the time provided by it was rendered impossible by change in plans and specifications made subsequent to the completion date?

■ The law is universally recognized, that where a party to a contract agrees to do something prior to a day certain and in default to pay a sum of money as liquidated damages, if the other party to the contract engages in conduct which prevents the doing of the thing contracted for in the specified time, such action amounts to a waiver of the claim for liquidated damages for delay. In United States v. United Engineering & Construction Co., 234 U.S. 236, loc.cit. 242, 34 S.Ct. 843, loc.cit. 845, 58 L.Ed. 1294, the Supreme Court said: "We think the better rule is that when the contractor has agreed to do a piece of work within a given time, and the parties have stipulated a fixed sum as liquidated damages, not wholly disproportionate to the loss for each day's delay, in order to enforce such payment the other party must not prevent the performance of the contract within the stipulated time; and that where such is the case, and thereafter the work is completed, though delayed by the fault of the contractor, the rule of the original contract cannot be insisted upon, and liquidated damages measured thereby are waived. Under the original and first supplemental agreements, the claimant knew definitely that he was required to complete the work by a fixed date. Presumably the claimant had made its arrangements for completion within the time named. Certainly the other contracting party ought not to be permitted to insist upon liquidated damages when it is responsible for the failure to complete by the stipulated date; to do this would permit it to recover damages for delay caused by its own conduct."

In the case of Guerini Stone Co. v. P. J. Carlin Const. Co., 248 U.S. 334, loc.cit. 340, 39 S.Ct. 102, loc.cit. 104, 63 L.Ed. 275, the Supreme Court made an observation pertinent to the facts in this case. We quote:

"It is sufficiently obvious that a contract for the construction of a building, even in the absence of an express stipulation upon the subject, implies as an essential condition that a site shall be furnished upon which the structure may be erected."

This Court quoted the above language in the case of Great Lakes Const. Co. v. Republic Creosoting Co., 8 Cir., 139 F.2d 456, 464, and stated: "And it is equally obvious that a contract to construct the flooring in a building implies timely provision of the situs for its location."

■ And so the sub-contract in this case calling for completion of work under it by December 15, 1940, contained the implied condition that the plans and specifications for all the work to be done including changes required by the Government, would be furnished to the appellant before and not after, the expiration date. The sub-contract cannot reasonably be construed as having required the appellant to do the impossible.

■ The law as stated is not challenged by the appellets. They seek to avoid its effect by a claim—"that appellees were not chargeable with any acts or omissions of the Government's engineers." The court below found, in substance, that the Construction Company did nothing to delay the appellant in the performance of the sub-contract. In a sense, that is true, since it was the acts of the Government engineers, for which neither the Construction Company nor the appellant was responsible, that caused or contributed to the failure of the appellant to complete the work required of him under the sub-contract within the time fixed by it. But the effect of the acts of the Government engineers was to add to, change and delay the work which, under the prime contract, the Construction Company was required to perform. These changes in the prime contract made it necessary for the Construction Company to call upon the appellant to do the changed work. The appellant was doing work which the prime contract obligated the Construction Company to perform for the Government. While the sub-contract required the appellant to do this work for the contractor, it was work which could not have been performed within the time prescribed in the sub-contract. A ruling that, under such circumstances, the appellant was liable to the Construction Company for liquidated damages for a delay which

could not have been avoided, we think cannot be justified.

■ Appellees further contend that under the prime contract provision was made for presenting to the government a request for extension of time, because of delay resulting from change in plans, including a provision "for appeals to the Chief of Engineers at Washington", and that this remedy was exclusive and binding upon the appellant. Based on this provision of the prime contract, it is appellees position that appellant should have presented his claim for extension of time to the Construction Company who would in turn present same to the Government and if the decision of the Government's engineers was adverse, appellant—"was *invited* to appeal but declined". Therefore appellees assert appellant is without any legal excuse for failure to complete work under the sub-contract by December 15, 1940 (plus the 34 days "given him" by the Construction Company). This argument overlooks the absence of any provision in the sub-contract requiring appellant to follow such procedure or obligating the Construction Company to present claims for extension of time on behalf of appellant or prosecute appeals from adverse decisions for him. On the contrary the sub-contract contains its own penalty clause. Same is not in harmony with the penalty clause in the prime contract. We quote:

"Section 5. The subcontractor agrees to furnish the materials and/or perform and complete the work called for under this Subcontract within the following time or times, towit:

"Begin Work July 15th, 1940. Complete Work December 15th, 1940.

"(fol. 14) and Upon his failure so to do the Subcontractor shall pay to the Contractor, as agreed liquidated damages and not as a penalty, the sum of Two Hundred and Fifty Dollars ($250.00) per day for each and every day of delay. The payment of such damages shall not release the Subcontractor from his obligation to otherwise fully perform this Subcontract.

"No allowance of an extension of time, for any cause whatever, shall be claimed by the Subcontractor or be made to him, unless the Subcontractor shall have made written request upon the Contractor for such extension, within forty-eight hours after the cause for such extension occurred, and unless the Contractor and Sub-contractor have agreed in writing upon the allowance of additional time to be made."

■■ Should the parties fail to agree, the sub-contract provided "the Engineer" should act as arbitrator. The appellant should, no doubt, have secured a written agreement from the Construction Company for the extensions of time of performance. Had he done so, he would have avoided this controversy. The procedure outlined in the sub-contract for obtaining an extension of time was ignored by the Construction Company as well as by the appellant. The Construction Company allowed appellant such extensions of time as were granted to the Construction Company by the Government for the completion of the prime contract, and did so without any written agreement with the appellant therefor. There is no suggestion in the correspondence of the Construction Company with appellant that he had exceeded his time limit or had rendered himself liable for liquidated damages or was not proceeding with due diligence under the circumstances shown to have existed. Estimates for work done by the appellant were paid without deduction after the completion date. The conduct and letters of the Construction Company are inconsistent with the theory that it was relying upon the requirement of the sub-contract that extensions of the time of performance were to be evidenced by written agreement. Whatever may have been the effect of the provisions of the sub-contract in this regard, it would not preclude the Construction Company from waiving, by words or conduct, the time of performance of the sub-contract or the right of the Construction Company to demand liquidated damages for delay.

Aside from the patent fact that the Government did not recognize appellant as a contractor on the project and appellant did not and could not apply to the Government for extension of time on his sub-contract, there is evidence showing that the Construction Company understood that its application to the Government engineers for extension of time was independent of its sub-contract with appellant. For example, on December 26, 1940 (10 days after completion date in the sub-contract), the Construction Company wrote appellant regarding extension of time. The Construction Company did not advise appellant to present claims for extension of time and appeal from adverse decisions through it, but on the contrary stated: "We believe all

of these matters enter in to your extension of time and assure you that *you will never find us anything but fair about it."* (Emphasis added)

John Kerns, President of the Construction Company, testifying regarding extension of time for appellant to finish work under the sub-contract, said: "A. Neither the John Kerns Construction Company nor I ever agreed to grant any extension of time to M. E. Gillioz. *It was my intention to treat him fairly and give him the benefit of any extension of time* that I received upon his work and for this reason we urged him time and again to prepare his claim and present it and offered to help him in every way possible". (Emphasis added)

At another point in the testimony of this witness he stated: "A. I did obtain an extension of time from the government for the performance of work on this contract. The only extension on the Gillioz work *was covered* by Change Order No. 5 on which 24 days was allowed. *I think he should be allowed this 24 days,* although a portion of the time was allowed because of other work." (Emphasis added)

That the Construction Company was not interpreting the sub-contract during the progress of the work, as now contended for by it, is further shown by the testimony of its representative Mr. Ball: "Q. The question was asked why you did not deduct these liquidated damages from estimates as they come out. A. That is not our practice. On these contract jobs where there is a general contractor and subcontractor on a job that is going to run over quite a period of time, *the general practice is to let these things be a kind of buffer account."* (Emphasis added) The "buffer" is now offered by the Construction Company as a barrier to appellant to collect for work actually performed by him.

Cases[3] cited by the appellees on this point are based on the right of a contractor under a contract with the Government, to "sue for additional compensation" for damages caused by delays resulting in change of plans, authorized by the construction contract. If the appellant had been the contractor and was making a claim against the Government for damages due to delay caused by change in the plans, these cases would be in point. We have no such issue before us.

We pass to appellant's second contention. Was the agreement by the Construction Company whereby it waived its claim for liquidated damages against appellant binding? We hold that it was.

In so holding we do not ignore the ruling of the Supreme Court of Arkansas in Feldman v. Fox, 112 Ark. 223, 164 S.W. 766, relied upon by the appellees. We do not consider this authority in point. In the Feldman case a share-cropper agreed to make a crop for a specified consideration. He became dissatisfied and to prevent stoppage of work the land-owner agreed to pay an additional compensation. There was no change in circumstances between the parties, other than the desire of the share-cropper to obtain additional compensation. The Court held that there was no consideration for the additional compensation. Such is not the case before us. At the time the Construction Company agreed to waive its claim for liquidated damages against appellant changes had been made in the work called for by the sub-contract, rendering it impossible for appellant to complete the contract on the date specified. The situation of the parties had thus changed since the signing of the sub-contract.

Nor do we believe under the record the agreement to waive liquidated damages was without consideration. The Construction Company desired appellant to continue his work in accordance with Change Order No. 5, issued on March 4, 1941, and approved April 14, 1941. Appellant had a contract to do certain work. He was to be paid for the work he did. At the time the agreement was made by the Construction Company to waive liquidated damages, the appellant made a further agreement with the Construction Company to surrender to the Construction Company a part of the work covered by its sub-contract and consequently the compensation therefor.[4]

Waiver of claim for liquidated damages by the Construction Company was consistent with the conduct of the parties. There can be little doubt that appellant would never have proceeded with work on the project, after Change Order No. 5 was

[3] United States v. Rice, 317 U.S. 61, 63 S.Ct. 120; United States v. Callahan Walker Const. Co., 317 U.S. 56, 63 S.Ct. 113.

[4] See Cuneo Press v. Claybourn Corp., 7 Cir., 90 F.2d 233, loc. cit. 236.

issued, unless the Construction Company had released him from its claim for liquidated damages at the rate of $250.00 per day.

The Supreme Court of Arkansas, in the case of American Mortg. Co. v. Williams, 103 Ark. 484, 145 S.W. 234, 239, said: "Mr. Pomeroy in his work on Specific Performance of Contracts, § 394, says: 'Whenever time is made essential, either by the nature of the subject-matter and object of the agreement or by express stipulation or by a subsequent notice given by one of the parties to the other, the party in whose favor this quality exists—that is, the one who is entitled to insist upon punctual performance by the other or else that the agreement be ended—*may waive his right to the benefit of any objection which he might raise to the performance after the prescribed time,* either expressly or by his conduct; *and his conduct will operate as a waiver when it is consistent only with the purpose on his part to regard the contract as still subsisting and not ended by the other party's default.*' This court has approved this principle from almost its earliest history, and has steadily adhered to it."[5]  (Emphasis added)

■ In the case of Stiewel v. Lally, 89 Ark. 195, 115 S.W. 1134, 1138, the same court made the following ruling, which we deem applicable to the facts in this case: "* * * a party to a contract containing a limitation as to time for performance, who induces the other party, after the expiration of the limit, to continue in the performance of the contract, will not be permitted to withhold the fruits of the contract because it was not performed within the specified time."

■ Did the Construction Company induce the appellant to continue in the performance of the sub-contract, after the expiration of the time limit? What other explanation can be offered for the letter written by it to the appellant on December 26, 1940 (10 days after expiration of the time specified in the sub-contract), wherein the Construction Company informed appellant regarding time for completion of his work—"you will never find us anything but fair about it".

■ The contention of the appellees that the oral waiver by the Construction Company of its right to collect liquidated damages from the appellant for delay was merged in the supplemental contract, which did not refer to liquidated damages and did not by its terms extend the time for the performance of the sub-contract, we regard as unsound. The waiver related to a right granted by a provision of the sub-contract as originally written, which right was not affected by the supplemental contract except in so far as the making of that contract was inconsistent with an intent on the part of the Construction Company to insist upon the performance of the sub-contract within the time specified in it. So far as the supplemental contract was concerned, the oral waiver was a matter of inducement which led up to a change of the position of the parties and contained the essential elements of an equitable estoppel.

The views expressed render it unnecessary to consider appellant's third contention.

The judgment appealed from is reversed and the case is remanded with direction to enter a judgment for appellant for the amount agreed to be due him of $14,023.86 and that judgment be entered against the appellees on the counter-claim.

5 Tidwell v. Southern Engine & Boiler Works, 87 Ark. 52, 112 S.W. 152; Grayling Lumber Co. v. Hemingway, 128 Ark. 535, 194 S.W. 508; Medling v. Stewart & Oliver, 179 Ark. 1001, 18 S. W.2d 1024; Little Rock Granite Co. v. Shall, 59 Ark. 405, 27 S.W. 562; Maryland Steel Co. v. United States, 235 U.S. 451, loc. cit. 458, 35 S.Ct. 190, loc. cit. 192, 59 L.Ed. 312; District of Columbia v. Camden Iron Works, 181 U.S. 453, loc. cit. 464, 21 S.Ct. 680, loc. cit. 684, 45 L.Ed. 948; Concordia Ins. Co. v. School Dist., 282 U.S. 545, loc. cit. 551, 51 S.Ct. 275, loc. cit. 277, 75 L. Ed. 528; 15 Am.Jur. 695 Sec. 262. Compare John Alt Furniture Co. v. Maryland Casualty Co., 8 Cir., 88 F.2d 36, 40.